UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| E&I GLOBAL ENERGY SERVICES, INC., and E&C GLOBAL, LLC,<br><br>           Plaintiffs,<br><br>vs.<br><br>JONATHAN D. DITTMER,<br><br>           Defendant. | 4:20-CV-04191-KES<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |

Plaintiffs E&I Global Energy Services, Inc. and E&C Global, LLC (collectively E&I) brought suit against defendant, Jonathan D. Dittmer, alleging takings and due process violations under the Fifth Amendment of the United States Constitution. Dockets 1. Dittmer moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Docket 13. E&I opposes the motion. Docket 16. For the following reasons, the court grants Dittmer's motion to dismiss.

## BACKGROUND

The facts as alleged in the complaint are as follows:

E&I is a small business that provides electrical and instrumentation construction, commissioning, maintenance, construction management, communication, manufacturing, and plant relocation services to the federal government. Docket 1 ¶ 6. Dittmer is a contracting officer for the United States

Department of Energy, Western Area Power Administration. *Id.* ¶ 8. E&I is suing Dittmer in his personal capacity. *Id.* at 1.

In September 2015, the United States awarded a contract to Isolux to construct the Hanlon Project, an electric substation, for the Power Administration. *Id.* ¶¶ 6, 13. The value of the contract was $9.9 million. *Id.* ¶ 13. Isolux's surety, Liberty Mutual Insurance Company, issued a performance bond in that amount guaranteeing Isolux's subcontractors and suppliers. *Id.* ¶ 14. E&I was one of the subcontractors on the Project. *Id.* ¶ 17. Under the contract, Isolux was to complete the project in 18 months. *See id.* ¶ 16.

During construction, Isolux submitted invoices for equipment, services, and milestone payments for WAPA's approval. *Id.* ¶¶ 18-19. These invoices included amounts owed to Isolux's subcontractors. *Id.* ¶ 19. Once Dittmer authorized payment to Isolux for equipment used on the Project, the equipment belonged to the government. *Id.* ¶ 20. While E&I was a subcontractor to Isolux, E&I reported to WAPA that Isolux had submitted invoices claiming that it had completed certain work on the Project when in fact it was not completed. *Id.* ¶ 22.

Isolux's work on the Project continued for about 15 months. *Id.* ¶ 21. Dittmer terminated Isolux for default on December 2, 2016, about three months before the Project's anticipated completion date. *Id.* ¶ 23. Upon default, Dittmer knew that Isolux had not completed certain parts of the Project and that it was not entitled to some of the milestone payments it had received. *Id.*

2

¶ 24. Dittmer had approved about $4 million, or about 41% of the Project's contract value, in payments to Isolux by the time it was terminated. *Id.*

Once Dittmer terminated Isolux, he failed to request or mandate a post-termination inventory as required by 48 C.F.R. §§ 49.101, 49.105, 49.402.2. *Id.* ¶ 26. Dittmer also failed to confirm that Isolux paid its equipment suppliers or its subcontractors. *Id.* ¶ 27. And Dittmer never verified whether Isolux had actually earned the milestone payments that it received. *Id.* WAPA subsequently settled its claims against Isolux for failing to timely complete the Project. *Id.* ¶ 28.

In December 2016, Dittmer encouraged E&I to bid on the Project as the prime contractor and to ratify subcontractor agreements with Isolux's subcontractors that were already working on the Project. *Id.* ¶¶ 31-32. To prepare a fixed-price contract bid, E&I reviewed information provided by Dittmer to Isolux's surety, Liberty Mutual. *Id.* ¶ 33. E&I contacted Dittmer when it noticed that certain drawings of the Project were missing from the information provided to Liberty Mutual. *Id.* ¶ 34. Dittmer informed E&I that it should bid on the project without additional drawings in order to save time. *Id.* ¶¶ 35-36. In drafting its bid, E&I relied on Dittmer's representations as to specific equipment that was paid for and at the project site and as to payments made to Isolux's contractors. *Id.* ¶ 37. E&I ultimately submitted a bid on the Project for $5.4 million. *Id.* ¶ 39. Based upon the information provided to E&I at the time it placed its bid, E&I believed it could complete the project on time. *Id.* ¶ 38.

On April 13, 2017, the Power Administration awarded E&I the prime contract for the Project. *Id.* ¶ 41. During the period between Isolux's termination and E&I becoming the prime contractor, Dittmer and WAPA had complete control of the Project site. *Id.* ¶ 30. They were obligated to protect the site from any changes that would affect the next prime contractor's completion of the Project. *Id.* Once E&I began its work as prime contractor, it discovered that Dittmer had misrepresented the availability of certain equipment at the Project site. *Id.* ¶ 42. And despite Dittmer previously authorizing payment to Isolux for certain equipment, E&I discovered that Isolux had not paid its equipment suppliers. *Id.* Consequently, when the suppliers learned that Isolux had been terminated on the Project, many of the suppliers canceled Isolux's order. *Id.* E&I also learned that many of Isolux's subcontractors had not been paid in full for their work up until Isolux's termination, and those subcontractors refused to resume their work on the Project until they received payment. *Id.* ¶ 43.

On April 20, 2017, the Power Administration hosted a Project "kick-off" meeting with E&I. *Id.* ¶ 44. At the meeting, E&I expressed concern about missing equipment and the resulting impact on the Project's schedule and cost. *Id.* In response, Dittmer stated, "We need to hurry and get the project moving. Any issues will be addressed as they come up." *Id.* E&I's contract with the Power Administration contained a "time is of the essence" clause with a per diem penalty beyond the completion date. *Id.* ¶ 46. This incentivized E&I to complete the Project on time and deal with cost issues later. *Id.* Following the

4

"kick-off" meeting, E&I began working on the Project, including fulfilling obligations not contemplated in the Tender Agreement but necessary for the Project's completion. *Id.* ¶ 45. E&I sought reimbursement for $400,000 to replace missing equipment that Dittmer had misrepresented was at the Project site. *Id.* ¶ 47. Dittmer denied E&I's Requests for Equitable Adjustments for missing equipment, directed changes, and weather delays. *Id.* ¶¶ 52-53. Dittmer advised E&I to seek payment from Liberty Mutual, but Liberty Mutual believed that the Power Administration was obligated to pay for missing equipment at the Project site. *Id.* ¶ 50. E&I alleges that Dittmer did not seek reimbursement from Isolux after termination because doing so would have exposed Dittmer to a Government Accountability Office audit. *Id.* ¶ 51.

Throughout the project, E&I communicated its concerns regarding the Project's funding and timeline with Dittmer. *Id.* ¶ 54. E&I requested an extension of time to complete the Project so that it could seek reimbursement from Liberty Mutual—an extension necessary only because of Dittmer's mismanagement and misrepresentations of Isolux's work on the Project. *Id.* ¶ 57. In February 2018, E&I reduced its workforce at the Project site because of financial difficulties caused by Dittmer's misrepresentations. *Id.* ¶ 59. Though Dittmer knew of the workforce reduction, it did not send a Notice to Cure. *Id.*

In March 2018, Dittmer sent E&I a Show Cause Notice asserting that E&I abandoned the Project. *Id.* ¶¶ 59, 61. E&I alleges that the Show Cause Notice was deficient under 48 C.F.R. § 49.402-3, because it failed to identify a

5

specific failure by E&I. *Id.* ¶ 62. When E&I responded to the Show Cause Notice, Dittmer summarily denied E&I's explanation for project delays and workforce reduction. *Id.* ¶ 61. Dittmer further violated the Federal Acquisitions Regulation System, Title 48 of the Code of Federal Regulations, by failing to provide E&I's sureties and the Small Business Administration notice of a pending decision to terminate E&I's contract. *Id.* ¶ 63. Dittmer terminated E&I as prime contractor on the Project on December 17, 2018. *Id.* ¶¶ 66-67.

E&I states that it brings "a unique Complaint" under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) alleging violations of the Fifth Amendment Takings Clause. *Id.* ¶¶ 1, 9, 72. E&I alleges that Dittmer, under the color of federal authority, interfered with E&I's contractual right to perform under the Project's Completion Agreement. *Id.* ¶ 74. E&I also alleges that Dittmer violated E&I's substantive and procedural due process rights because Dittmer's "actions and refusals to compensate E&I for its drastically increased cost of performance under the Completion Agreement rendered E&I's property interest in the contract valueless." *Id.* ¶ 69. E&I states that Dittmer's actions amount to more than a breach of contract and were "intentional and tantamount to fraudulent misrepresentation [] done with the sole purpose to get E&I to complete the Project within the original Project budget." *Id.* E&I seeks just compensation for its alleged Takings Clause and due process violations, including liquidated damages, punitive damages, attorneys' fees, and other just legal and equitable relief. *Id.* at 19.

## LEGAL STANDARD

Rule 12(b)(6) provides for dismissal of a claim if the claimant has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The court must accept the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). The "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (internal quotation marks and citation omitted). "If a plaintiff cannot make the requisite showing, dismissal is appropriate." *Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008).

## DISCUSSION

A suit brought under *Bivens* recognizes an "implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). Three such implied private actions for constitutional violations have been recognized by the Supreme Court. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). In *Bivens*, the Supreme Court enforced a damages remedy against

Federal Bureau of Narcotics agents who violated the petitioners Fourth Amendment right against unreasonable search and seizure. *Bivens*, 403 U.S. at 395-96.

> In *Davis v. Passman*, 442 U.S. 228 (1979), an administrative assistant sued a Congressman for firing her because she was a woman. The Court held that the Fifth Amendment Due Process Clause gave her a damages remedy for gender discrimination. And in *Carlson v. Green*, 446 U.S. 14 (1980), a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma. The Court held that the Eighth Amendment Cruel and Unusual Punishments Clause gave him a damages remedy for failure to provide adequate medical treatment. These three cases—*Bivens*, *Davis*, and *Carlson*— represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself.

*Ziglar*, 137 S. Ct. 1854-55 (cleaned up). Since *Bivens*, *Davis*, and *Carlson*, "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity" and has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Id.* at 1857 (citations omitted). The Eighth Circuit Court of Appeals has adopted a "presumption against judicial recognition of direct actions for violations of the Constitution by federal officials." *Farah v. Weyker*, 926 F.3d 492, 500 (8th Cir. 2019) (quoting *Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005)).

Whether the court should recognize a *Bivens* remedy "involves two steps." *Id.* at 498. First, the court must determine whether the case before it "present[s] one of 'the three *Bivens* claims the [Supreme] Court has approved in the past' or whether, instead, allowing the plaintiff[] to sue would require [the court] to extend *Bivens* to a 'new context.' " *Id.* (quoting *Ziglar*, 137 S. Ct. at 1859-60). If the claim has not previously been recognized as a *Bivens* claim,

8


the court proceeds to step two. *Id.* At step two, the court asks "whether any 'special factors counsel[] hesitation' before implying a new cause of action 'in the absence of affirmative action by Congress.' " *Id.* (quoting *Ziglar*, 137 S. Ct. at 1857). "Related" to this second step is the question of whether an alternative remedy exists. *Ziglar*, 137 U.S. at 1858; *see also Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

I.    **Whether E&I Presents a *Bivens* Claim in a New Context**

"If [a] case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Ziglar*, 137 S. Ct. at 1859.

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. E&I readily concedes, and Dittmer agrees, that the facts of this case "amount to an uncontemplated theory under *Bivens*" and that its claims arise in a new context. Docket 16 at 5-6; Docket 14 at 8. Of the three *Bivens* actions recognized by the Supreme Court, only *Davis v. Passman* involved a Fifth Amendment Due Process violation, but that was in the context of gender discrimination. 422 U.S. 228, 235, 248 (1979); *Cf. Ziglar*, 137 S. Ct. at 1864 (finding that even in a case with "significant parallels" to a prior *Bivens* case, a "modest extension" of *Bivens* is an extension nonetheless). Here, the court finds

that E&I does not present *Bivens* claims recognized by the Supreme Court, and E&I asks this court to extend *Bivens* to a new context. Thus, the court proceeds to the second step.

## II. Whether Special Factors Counsel Hesitation to Recognize *Bivens* Claims

"[A] Bivens remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Ziglar*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18). "It does not take much" for the court to hesitate, "because in most instances, Congress is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Farah*, 926 F.3d at 500 (cleaned up). The Supreme Court has not identified a specific or exhaustive list of special factors, but it has described how the court should analyze step two:

> [T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. . . . [T]he decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. . . . In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

*Ziglar*, 137 S. Ct. at 1857-58. A related inquiry is whether an alternative remedy exists. *Id.* at 1858.

10

### A.     Whether an Alternative Remedy Exists

"If Congress has created any alternative, existing process for protecting the injured party's interest," "that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* (cleaned up). The alternative remedy need not provide the same relief sought under *Bivens*. *Farah*, 926 F.3d at 502. The alternative need only provide "some redress" for the plaintiff. *Malesko*, 534 U.S. at 69. The Supreme Court has "made clear that even remedies that provide no compensation to victims and little deterrence for violators . . . trigger the general rule that, 'when alternative methods of relief are available, a *Bivens* remedy usually is not.' " *Farah*, 926 F.3d at 502 (quoting *Ziglar*, 137 S. Ct. at 1863). "*Bivens* remedies are the exception, and if they were available every time 'roughly similar' remedies are not, then *Bivens* would become the rule, available in all but the most unusual constitutional cases." *Id.*

### 1. Alternative Remedy for Takings Claim

E&I admits that "there is a mechanism to resolve [the] breach of contract claim and potentially [the] takings claim[.]" Docket 16 at 6. Dittmer agrees and argues that the Tucker Act provides one alternative remedy. Docket 14 at 9. Under the Tucker Act, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded [] upon the Constitution . . . or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

The Eighth Circuit Court of Appeals has not specifically addressed whether the Tucker Act provides an alternative remedy to a Fifth Amendment takings claim brought under *Bivens*. But several "district courts have declined to infer a *Bivens*-takings claim when relief under the Tucker Act is available." *Christopherson v. Bushner*, 2021 WL 1692151, at *10 (W.D. Mo. Apr. 29, 2021); *see also Davis v. Wernick*, 2021 WL 310999, at *3 (D.D.C. Jan. 29, 2021) (reaching the same conclusion as *Christopherson* and identifying four other district courts that did the same). And though not in the context of a *Bivens* claim, the Supreme Court has observed that "Congress enacted the Tucker Act to 'supply[y] the missing ingredient for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable.'" *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1328 n.12 (2020) (quoting *United States v. Bormes*, 568 U.S. 6, 12 (2012)).

E&I does not dispute that the Tucker Act can provide *some* remedy for allegations under its takings claim. Docket 16 at 6-8. It argues only that the Tucker Act does not provide *all* of, or the same, relief it seeks under *Bivens*. *See id.* But that is not the test. Here, Congress has acted by creating an express cause of action in the Tucker Act. Thus, the court finds that E&I has an alternative remedy for its Takings violations alleged in the complaint.

### 2.   Alternative Remedy to Due Process Claim

Dittmer argues that the Contract Disputes Act, 41 U.S.C. § 7103, and the Federal Acquisition Regulation System, Title 48 C.F.R., provide alternative remedies to E&I's Fifth Amendment Due Process claim. Docket 14 at 10. E&I

responds only as to the Contract Disputes Act and argues that the Act does not apply to the due process claim because the allegations in the complaint turn on "fraudulent and misleading actions" and intentional torts. Docket 16 at 9-10.

Section 7103(c)(1) of the Contract Disputes Act specifically exempts "any claim involving fraud." But E&I's Due Process claim includes more than alleged acts of fraud. *See* Docket 1 ¶¶ 77-84. It also alleges due process violations under the Federal Acquisition Regulation System. *Id.* ¶ 81. In February 2019, E&I brought suit against the United States in the Federal Court of Claims under the Tucker Act and the Contract Disputes Act. *See generally* Docket 15-1. There, E&I alleges five causes of action: (1) breach of implied duty of good faith and fair dealing; (2) fraudulent inducement; (3) misrepresentation/concealment; (4) breach of contract; and (5) wrongful contract termination. *Id.* at 20-31. Those claims appear to be substantially similar to those brought in Count II of the Complaint in this matter. Even if unsuccessful, and although not entirely congruent with the relief sought in this suit brought under *Bivens*, the court finds that E&I has an alternative remedy to its Due Process *Bivens* claim.

## B. Other Special Factors

The availability of alternative remedies "alone" causes the court here to hesitate before implying new causes of action under *Bivens*. *See Ziglar*, 137 S. Ct. at 1858. These alternatives demonstrate that Congress has contemplated disputes such as those alleged by E&I and has fashioned statutory remedies as it sees fit that provide relief through administrative and judicial forums. *See* 41

13

U.S.C. §§ 7103-7107; 28 U.S.C. § 1491. In light of these alternative remedies, "recognizing an implied cause of action here would pose a greater risk of interference with the other branches of government than it did in *Bivens*." *Farah*, 926 F.3d 499. The court finds that the special factors cause the court to hesitate before extending *Bivens* to a new context. Thus, having completed the requisite two-step analysis, the court declines to recognize E&I's *Bivens* claims. And because the court declines to recognize a cause of action under *Bivens*, it need not reach the issue of qualified immunity. *See* Docket 14 at 12-17; *Greening*, 398 F.3d at 1085 ("Because we resolve the instant case on the lack of a *Bivens* remedy, we do not reach the issue of qualified immunity.").

## CONCLUSION

E&I asks this court to recognize *Bivens* claims under the Takings Clause and the Due Process Clause of the Fifth Amendment. These claims would extend *Bivens* to a new context. Alternative remedies exist and special factors counsel hesitation before recognizing the implied causes of action in E&I's complaint. Thus, it is

ORDERED that Dittmer's motion to dismiss for failure to state a claim (Docket 13) is granted.

Dated December 6, 2021.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE